# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

RONALD M. SINGLETON,
    Petitioner,

No. 3:10-cv-1432 (SRU)

    v.

COMMISSIONER OF CORRECTIONS,
    Respondent.

## RULING AND ORDER

This is a federal habeas petition, pursuant to 28 U.S.C. § 2254, for which the respondent, the Commissioner of Corrections for Connecticut, and the petitioner, Ronald M. Singleton, have cross-moved for summary judgment (doc. # 15 & # 23). Singleton's petition raises three grounds for relief, all centered around his claim that the trial court's erroneous jury charge on self-defense/ justification violated his constitutional right to due process.

For the following reasons, I GRANT Singleton's petition, DENY the Commissioner's motion for summary judgment, and REMAND to the Superior Court for the Judicial District of New Haven for a new trial consistent with this Order. Unless Singleton is retried within 60 days of this Order, he shall be released from custody.

## I.    Background

Based on the evidence at trial, the jury reasonably could have determined the following facts: Singleton and Leonard Cobbs were friends who had used illegal drugs together. On one occasion, Cobbs purchased those drugs with Singleton's money, but failed to reimburse Singleton for Cobbs' share, which was $180. On December 18, 2002, Singleton asked Cobbs to pay him. Cobbs indicated that he did not have the money, but agreed to bring the money to Singleton's apartment later that day.

Cobbs was under the influence of cocaine when he arrived at Singleton's apartment, and he appeared angry and frustrated. When Singleton asked him about the money, Cobbs began "babbling" and using profanity in response to which, Singleton moved toward Cobb and stated that he was "going to fuck [him] up." There was some testimony that Cobbs offered to compensate Singleton with oral sex in lieu of payment, and that Singleton rejected that offer and was angered by it.

At approximately 6:45 p.m., an altercation between the two men commenced.[1] Cobbs removed a screwdriver from his pocket, prompting Singleton to back away. Cobbs stabbed Singleton in the chest with the screwdriver, and then Singleton grabbed him, causing him to drop the implement. After a further struggle, Cobbs and Singleton separated and Cobbs grabbed a knife from a knife block on Singleton's kitchen counter. Singleton told Cobbs he was going to call the police on Cobbs and that Cobbs was "going to jail." Cobbs then came at him with the knife. Singleton testified that there was a struggle over the knife, during which he "grabbed" and "bent" Cobbs' wrist in an effort to take the knife away from him. At some point, Cobbs stopped resisting and staggered over to the wall. Singleton helped Cobbs up and he sat down on Singleton's bed. Singleton testified that he initially thought Cobbs "was kidding," but when he rolled off the bed and onto the floor, Singleton saw a bloodstain on Cobbs' sweater and discovered that he had been stabbed by the knife during the struggle. In fact, it was ultimately discovered that Cobbs had sustained several injuries, including a cut through his chest, a cut on his back, and three small puncture wounds on the back of his head that could have been caused

---

[1] Singleton had no knowledge of the timing of the struggle, but a downstairs neighbor testified that he heard a loud crash from Singleton's apartment at about 6:45 p.m.

by the screwdriver.[2] The chest wound that caused Cobbs' death was seven and one-half inches deep, running from left to right, and caused by a downward strike. That wound penetrated the chest wall, a portion of the left lung, the pericardium and the heart, the diaphragm, and terminated in the liver.

Singleton did not immediately call for help, which delay he explained as the result of a combination of shock as well as a fear of the police as a result of his criminal record. Instead, he initially disposed of the knife blade—which had broken off from the handle at some point during the struggle—by throwing it down the garbage chute. Singleton also attempted to clean the apartment. At 7:22 p.m., roughly thirty minutes after the altercation, Singleton called his girlfriend, Victoria Salas, who came over to the apartment. On arrival, she attempted to revive Cobbs and called 911. At approximately 8:51 p.m., Singleton used Salas' phone to call the building maintenance supervisor, who then helped him retrieve the blade from the chute. At 9:06 p.m., Salas called the police department, and officers arrived shortly thereafter. The officers observed blood throughout the apartment. The knife had Cobbs' blood on it. The screwdriver had DNA from Cobbs on the handle, Singleton's blood on the shaft, and a mixture of both men's blood on the tip with Singleton's DNA as the major contributor. One officer observed that Singleton was bleeding from the middle of his chest, from a wound that was later determined to have been caused by the screwdriver.

In his initial statement to the police and at every subsequent opportunity continuing through trial, Singleton admitted that Cobbs had been wounded in the course of a struggle with Singleton over a knife, but denied any intent to harm or kill him. Instead, he raised a species of

---

[2] In his closing argument, Singleton's counsel noted that several medical professionals failed to include the wounds on the back of Cobbs' body in their reports, creating some doubt regarding when they occurred.

self-defense argument, asserting that Cobbs' fatal injuries resulted from a physical altercation in which: (i) Cobbs grabbed a knife; (ii) Singleton responded by grabbing Cobbs' wrist, thereby using "nondeadly" force to disarm him; and (iii) during the struggle over the knife, Cobbs was accidentally stabbed in the chest. Singleton did not concede at any point that he had intentionally stabbed the victim, or used deadly physical force against him.

Singleton was charged with murder as well as the lesser included offense of intentional manslaughter in the first degree. Throughout the presentation of evidence, Singleton's counsel described his client as claiming that he acted in "self-defense." At the close of evidence, both parties requested jury instructions on the concept of self-defense. The State's proposed instructions referred to "deadly physical force," in contrast to Singleton's proposed instructions, which referred to "reasonable physical force" and the use of a "dangerous instrumentality." *See Singleton*, 292 Conn. at 740. The trial court adopted the State's proposal that the jury should be instructed only on the use of deadly physical force in self-defense.

Despite losing the argument over the self-defense instruction, Singleton's counsel repeatedly referred to the concept of "self-defense" during his closing. He also apparently tried to indicate, however, that the issue of intent was not conceded. Instead, in keeping with Singleton's testimony throughout the trial, defense counsel's primary argument was that Singleton had used nondeadly force to defend himself during the struggle, which use of force inadvertently resulted in Cobbs' death—that is to say, although he argued that Singleton acted in "self-defense," defense counsel did *not* argue that Singleton intentionally stabbed Cobbs because he feared for his life. The State's closing and rebuttal also stated explicitly that Singleton's defense was one of "self-defense," and did not take up the distinction between deadly and nondeadly physical force, nor Singleton's claim that Cobbs' stabbing was an accidental result of

4

the struggle.

The final instructions given to the jury began with a short introduction to the role of the jury, the distinction between direct and circumstantial evidence, the State's burden of proof as a general matter, and issues of credibility. The trial court then launched into lengthy instructions on the question of self-defense / justification before instructing the jury on the elements of the crimes charged. Throughout the self-defense instructions, the court repeatedly used phrases suggesting that Singleton had, in fact, used deadly physical force, which it defined as: "physical force which can be reasonably expected to cause death or serious physical injury."[3] Tr. at 100 (Dec. 12, 2003). For instance, the court's instruction began as follows:

> The defendant claims that he acted in self-defense. In claiming that he acted in self-defense, the defendant is claiming that his use of deadly physical force was reasonable.
>
> Deadly physical force means physical force which can be reasonably expected to cause death or serious physical injury.

Tr. at 100 (Dec. 12, 2003). Similar language is used repeatedly in the instruction. *Id.* at 100–04. During the self-defense instructions, the trial court did not direct the jury that Singleton's use of deadly force was not admitted, or that the justification defense itself should be considered only if the jury *first* found that Singleton had, in fact, intentionally used deadly physical force. It also did not explain that Singleton's counsel's references to "self-defense" during his closing argument were intended as an explanation of Singleton's nondeadly conduct *during* the struggle, rather than as a reference to a justification defense, which would require an admission that Singleton had intentionally used deadly physical force against the victim in a protective and justified use of force.

---

[3] That definition follows the statutory definition in Conn. Gen. Stat. § 53a-3(5).

Later on in the instructions, the trial court instructed the jury on the question of intent, stating: "Under our law a person acts intentionally with respect to a result when his conscious objective is to cause such result." Tr. at 106 (Dec. 12, 2003). The court went on to explain that intent is generally inferred from other evidence, and distinguished intent from motive. It did not, however, state that Singleton's defense involved a claim of accident or give any instructions on how a successful claim of accident would negate a finding of intent.

Finally, the trial court instructed the jury on the elements of the crimes charged. With respect to the murder charge, the court stated:

> A person is guilty of murder when, with intent to cause the death of another person, he causes the death of a person.[4] This means the State must prove beyond a reasonable doubt, one, that the defendant specifically intended to cause the death of a person; two, acting with that intent, the defendant caused the death of [the victim] by stabbing him with a knife; and, three, the defendant was not justified in using deadly physical force.

Tr. at 108 (Dec. 12, 2003). The court went on to explain those elements in more depth. The requisite intent was explained as follows:

> [T]he State has the burden to prove beyond a reasonable doubt that the defendant, acting with that specific intent, caused the death of [the victim]. This means, of course, the State must prove beyond a reasonable doubt that the death of [the victim] was caused by the action of the defendant by stabbing [the victim] with a knife.

Tr. at 109 (Dec. 12, 2003).

With respect to intentional manslaughter in the first degree, the court stated:

> A person is guilty of intentional manslaughter in the first degree when, with intent to cause serious physical injury to another person, he causes the death of such person.[5]

> In order to prove the defendant guilty of intentional manslaughter in the first degree, the State has the burden to prove beyond a reasonable doubt, one, the defendant had the specific intent to cause serious physical injury to a person and, two, acting with

---

[4] That definition follows the statutory definition provided in Conn. Gen. Stat. § 53a-54a.

[5] That definition follows the statutory definition provided in Conn. Gen. Stat. § 53a-55(a)(1).

that specific intent, the defendant caused the death of [the victim] by stabbing him with a knife; and, three, the defendant was not justified in using deadly physical force.

Tr. at 110–11 (Dec. 12, 2003). Explaining the third "element" of that crime, the court stated:

> Also, the State has the burden to prove beyond a reasonable doubt that the defendant was not justified in using deadly physical force. You will recall and apply the instructions I have given you regarding justification.

Tr. at 111 (Dec. 12, 2003). The court provided no direct explanation of Singleton's primary theory of defense, which was effectively accident or a lack of intent, nor the proper order in which to evaluate the elements of the charged offenses and a justification defense.

The jury deliberated for several days, during which time it asked the court for clarification on, among other things, the meaning of "intended." After conferring with the parties, the trial court stated: "[T]he word intend means to have in mind some purpose or plan." Tr. at 120 (Dec. 12, 2003). The jury also asked that the trial court re-read the jury instructions in full. Tr. at 4 (Dec. 15, 2003). Shortly thereafter, the jury announced that it was deadlocked, prompting a "Chip-Smith" instruction[6] from the trial court. Tr. at 31 (Dec. 15, 2003).

The jury ultimately acquitted Singleton of murder, but found him guilty of the lesser included offense of manslaughter in the first degree. Thereafter, the court rendered judgment, sentencing Singleton to a total effective term of 20 years' imprisonment.

A.  Singleton's Appeal to the Connecticut Court of Appeals

Before the Connecticut Court of Appeals, Singleton claimed that the trial court's instructions were improper because the trial court had failed to submit to the jury the factual question whether Singleton had used deadly or nondeadly force during his struggle with the victim prior to the stabbing. *See Singleton*, 97 Conn. App. at 687. The Appellate Court agreed,

---

[6] *See Connecticut v. O'Neil*, 261 Conn. 49, 74–75 (2002).

concluding that:

> The defendant testified that he grabbed the victim's wrists and that during this physical encounter, the knife ended up wounding the victim. We cannot conclude, as a matter of law, that such actions constituted deadly physical force. The defendant was entitled to have the jury, rather than the court, make that factual determination . . . . Simply put, the jury did not have the opportunity to consider the factual issue of whether the defendant used deadly or nondeadly physical force.

*Id.* at 696 (internal quotation marks, citations, and footnote omitted).

The Appellate Court further held that because the jury had been deprived of the opportunity to consider whether Singleton had used appropriate, nondeadly force in the struggle, "the improper instructions prejudiced the defendant by making it easier for the state to disprove the claim of self-defense." *Id.* at 697. Because the evidence against Singleton was not "so overwhelming as to render the improper instruction[s] harmless," the Appellate Court ordered a new trial. *Id.* at 698.

### B.  State's Appeal to the Connecticut Supreme Court

The State appealed to the Connecticut Supreme Court. There, the State argued that there was "no dispute that the defendant inflicted the fatal stab wound with the knife and that, once the jury determined that he had done so intentionally, all that was left to decide regarding his claim of self-defense was whether his actions were justified, thereby rendering irrelevant the issue of whether he had used deadly or nondeadly force during the struggle that preceded the stabbing." *Singleton*, 292 Conn. at 745.

A majority of the Connecticut Supreme Court agreed with the State that the jury instructions were not improper under the circumstances, and accordingly reversed the decision of the Appellate Court. *See id.* at 750. The Supreme Court reasoned that, although he "cloak[ed] his claim in the language of self-defense," Singleton's core defense was not, in reality, a justification

defense for engaging in otherwise criminal conduct. Instead, the Supreme Court concluded that Singleton's primary defense was that the stabbing was merely *accidental* and therefore aimed at the intent element of the crime itself. *See id.* at 751. It further determined there was no need for a specific instruction on the defense of accident because "the court's instruction on the intent required to commit the underlying crime is sufficient in such circumstances." *Id.* at 752. Despite having identified Singleton's primary defense as one of accident, however, the Supreme Court, like the Appellate Court, considered Singleton's request for a charge on the use of "nondeadly force" solely in terms of whether that instruction would be appropriate in connection with a justification defense. Because the use of nondeadly force would be irrelevant to the crime charged—that of murder or manslaughter in the first degree—the Supreme Court reasoned that the trial court's decision to decline to provide an instruction on self-defense using nondeadly force was not in error. *See id.* at 755.

The Supreme Court also rejected Singleton's claim that the jury instructions, by emphasizing Singleton's defensive use of "deadly" rather than "nondeadly" force in self-defense, essentially "directed a verdict" on the issue of intent to cause serious physical injury, the mens rea of intentional manslaughter under Connecticut law. The Supreme Court determined that the trial court correctly instructed the jury when, during its instruction on the elements of the charged offenses, it explained that the jury must *first* find "intent" and "causation" before reaching the question of justification. The Supreme Court reasoned that logically, once the jury found that Singleton had the requisite intent to commit manslaughter, "it necessarily would have rejected his claim of accident, or unintended consequences, thus completely removing from the jury's consideration the issue of whether the defendant used deadly or non-deadly force during the preceding struggle." *Id.* at 753.

Two Justices issued a sharply-worded dissent. *See id.* at 770–83 (Palmer and Katz, J.J.s, dissenting). The dissenters agreed with Singleton that "the trial court had violated his constitutional right[7] to present a defense by failing to instruct the jury on the defendant's primary theory of defense." *Id.* at 770. They observed that Singleton had "steadfastly maintained that he had used nondeadly force in attempting to wrest the knife away from the victim" throughout the trial. *Id.* at 775. But instead of enabling the jury to consider Singleton's accident defense, the dissenters argued that "the trial court, in instructing the jury, repeatedly explained, in clear and unequivocal language, that the defendant's *sole* claim was that *he had, in fact, used deadly physical force* against the victim, that is, he had intentionally stabbed the victim, but that he was justified in doing so." *Id.* (emphasis in original). Although the majority hung its hat on the fact that the trial court eventually instructed the jury to consider intent before considering the justification defense, the dissenters pointed out that the trial court had already repeatedly instructed the jury that Singleton had conceded his use of deadly force in self-defense and did so *before* instructing on the elements of murder/manslaughter. *Id.* at 776–77. As a result, the dissenters argued that the majority was incorrect to assume that Singleton's claim of accident did not warrant a special instruction. *Id.* at 779. Accordingly, the dissenters would have upheld the decision of the Appellate Court to grant Singleton a new trial.

## II.    Standard of Review

A federal court will entertain a petition for writ of habeas corpus challenging a state court conviction only if the petitioner claims that his custody violates the Constitution or federal law.

---

[7] The "constitutional right" to which the dissenters refer here is recognized under Connecticut state law, rather than the U.S. Constitution. *See Singleton*, 292 Conn. at 770 (Palmer and Katz, J.J.s, dissenting).

*See* 28 U.S.C. § 2254(a). A claim that a state conviction was obtained in violation of state law is generally not cognizable in federal court. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court cannot grant a petition for a writ of habeas corpus filed by a person in state custody with regard to any claim that was rejected on the merits by the State court unless the adjudication of the claim in state court either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The parties appear to agree that the relevant question in this case is whether the Connecticut Supreme Court's decision was an "unreasonable application" of clearly-established federal law. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). In conducting that inquiry, federal courts are required to give significant "deference and latitude" to the state court's determinations, and to deny habeas relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough*, 541 U.S. at 664).

## III.    Discussion

Singleton's petition asserts that the trial court's instruction on self-defense "violated the

defendant's constitutional rights to due process and to present a defense by taking from the jurors

the disputed factual issue of whether the defendant's conduct constituted the use of deadly or

nondeadly physical force [so that] the trial court effectively directed a verdict on the disputed

element of intent." *See* Petition (doc. # 1), at 7–8. In his memorandum, Singleton parses out that

claim into three arguments:

> 1.  That the trial court's failure to instruct the jury on the use of nondeadly force deprived [Singleton] of his primary defense, in derogation of his constitutional rights to present a defense and due process;
>
> 2.  That the trial court's instructions to the jury thus took from the jury the disputed factual issue of whether [Singleton]'s conduct constituted the use of deadly or nondeadly physical force; and
>
> 3.  That the trial court's instructions had the effect of directing a verdict on the essential element of intent.

Opp'n to Resp't's Mot. for Summ. J. (doc. # 23), at 2 (hereinafter "Pet.'s Mem.").

Those arguments are aimed at different aspects of the same error: Singleton asserts that

the trial court's instructions as a whole informed the jury in no uncertain terms that Singleton

conceded that he used deadly physical force in self-defense, when in fact Singleton's consistent

defense was that an accident had occurred in the course of his use of *non*deadly force to fend off

Cobbs. Because, under Connecticut law, the definition of deadly physical force is practically

interchangeable with the intent requirements for murder and manslaughter, the trial court's

emphatic instruction that Singleton *had used* such force improperly signaled to the jury that the

issue of intent was conceded—save for a choice between those two offenses—thereby depriving

Singleton of the opportunity to have the jury consider his accident defense and lessening the

State's burden to prove intent. And Singleton argues that the Connecticut Supreme Court

majority thus deprived him of due process when it reversed the Appellate Court's decision to

grant him a new trial conducted without that highly prejudicial error.

I first consider the preliminary question of exhaustion. Next, I consider whether Singleton has identified an "unreasonable application" of federal law. Having determined that the Connecticut Supreme Court majority unreasonably applied clearly-established constitutional standards when it failed to remedy the serious due process defects in Singleton's trial, I finally take up whether the result was nevertheless harmless. I hold that it was not—the trial court's prejudicial instructions likely "had a profound effect on the trial" because they deprived Singleton of the opportunity to have the jury consider his credible defense of accident. *Davis v. Strack*, 270 F.3d 111, 116 (2d Cir. 2001). Accordingly, I conclude that this is the rare case in which habeas relief should be granted.

A.  Exhaustion

The parties agree that Singleton properly exhausted two of the three arguments he raises in his habeas petition. The State contends, however, that Singleton did not exhaust his third argument, that the "trial court's instructions had the effect of directing a verdict on the essential element of intent." *See* Resp.'s Mem. at 37–42 (doc. # 17-1). Although Singleton clearly raised that claim in his motion for reconsideration filed with the Connecticut Supreme Court, Respondent argues that he never "fairly presented" the exact question for the Connecticut Supreme Court's review on direct appeal.

A prerequisite to habeas relief under section 2254 is the exhaustion of all available state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is not jurisdictional; rather, it is a matter of federal-state comity. *See Varszegi v. Armstrong*, 2002 WL 180891, at *2 (D. Conn. Jan. 25, 2002) (citing *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)). Ordinarily, the exhaustion requirement has been satisfied if

13

Case 3:10-cv-01432-SRU    Document 34    Filed 07/19/17    Page 14 of 28

the federal issue has been fairly presented to the highest state court. *See O'Sullivan*, 526 U.S. at 839–40; *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990). A petitioner may also exhaust his state-court remedies by pursuing his claims through a full round of state post-conviction proceedings. *Castille v. Peoples*, 489 U.S. 346, 350–51 (1989).

Here, although Singleton did not present his "directed-verdict" argument to the Connecticut courts in the exact iteration he uses here, he repeatedly argued there that the challenged instruction had a "misleading impact on the factual questions of whether or not defendant acted with the intent to cause serious physical injury." *See* Br. of the Def.-Appellee, at 28, attached as App'x K to Resp.'s Mem. (doc. # 17-1). Moreover, the Connecticut Supreme Court actually addressed the challenged argument in its decision. *See Singleton*, 292 Conn. at 758 n.17 ("The defendant argues, and the dissent agrees, that the trial court flatly told the jurors that the defendant had used deadly force . . . even before telling them that they had to decide something about the defendant's intention when he used such deadly force. . . . Accordingly, there is no merit to the claim that the court's instructions on justification improperly influenced the jury's consideration of intent[.]"). Thus, because the Connecticut Supreme Court had an opportunity to consider that issue and actually did so, I conclude it has been properly exhausted.

   B.   <u>Whether the Connecticut Supreme Court's Ruling was an "Unreasonable Application" of Clearly-Established Federal Law</u>

I now consider whether the Connecticut Supreme Court's ruling was an "unreasonable application" of clearly-established federal law. Keeping in mind the significant deference owed to the State's highest court, I nevertheless determine that its decision was so erroneous that it merits habeas relief. The Connecticut Supreme Court majority correctly identified Singleton's primary defense as one of accident, which was in keeping with his consistent testimony, and

14

observed that the trial court did not provide any direct instructions on that defense. The Supreme Court deviated from the requirements of the Constitution, however, when it failed to recognize the impact of the trial court's emphatic and repeated statements to the jury that Singleton had *conceded* his use of deadly physical force in the self-defense instruction, a directive made all the more prejudicial by the similarities between the definition of deadly force and the mens rea requirement for manslaughter under Connecticut law. And the Connecticut Supreme Court majority further ignored United States Supreme Court precedent by failing to consider how the larger context of the jury instructions, and indeed, counsel's presentation of the case, amplified those prejudicial effects, depriving Singleton of his due process rights to present a complete defense and to have the State prove every element of the charged offense beyond a reasonable doubt.

The standard for assessing whether state court jury instructions violated a defendant's due process rights is well-established. A federal habeas court must consider "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Middleton*, 541 U.S. at 437; *Estelle v. McGuire,* 502 U.S. 62, 72 (1991). For a petitioner to receive habeas relief on an improper jury instruction claim, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp,* 414 U.S. at 146; *see also Boyde v. California*, 494 U.S. 370, 380 (1990) (instructing courts to inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution). The Supreme Court has instructed that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*,

414 U.S. at 146–47. Finally, although the State court's legal reasoning is due great deference, its own interpretation of the disputed instruction does not determine whether there was a "reasonable likelihood" that the jury would misapply the instruction. *See Francis v. Franklin,* 471 U.S. 307, 315–16 (1985); *Sandstrom*, 442 U.S. at 516–17.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The errors in this case implicate two core principles of criminal due process. First, the Constitution requires that criminal defendants be afforded "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The right to present a defense has long been viewed as central to ensuring the fundamental fairness of any valid criminal prosecution. *See Trombetta*, 467 U.S. at 485 ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."). And the right to present a complete defense includes the right to have the jury consider it. *See Davis v. Strack*, 270 F.3d 111, 116 (2d Cir. 2001) (holding that the trial court's erroneous decision not to instruct the jury on a credible defense for which the defendant was entitled to instruction under state law violated due process).

The Fourteenth Amendment also requires that the State shoulder the burden of proving beyond a reasonable doubt all elements of a crime. *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citing *Sandstrom v. Montana*, 442 U.S. 501, 520–21 (1979)). In the landmark case of *In re Winship*, 397 U.S. 358 (1970), the Supreme Court explained the crucial moral and Constitutional importance of that standard:

The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt. . . .

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

*Id.* at 363–64.

With those essential principles in mind, I turn to Singleton's arguments here. As the Connecticut Supreme Court majority correctly recognized, Singleton's primary defense at trial was that the victim's death was an accident that occurred during a struggle and accordingly, Singleton lacked the requisite intent to commit the charged offenses. *See Singleton*, 292 Conn. at 751–53. Recognizing that Singleton's primary defense was one of accident, rather than justification, distinguishes this case from many of the decisions discussed by both parties in their briefs. As the State points out, the Supreme Court, in *Gilmore v. Taylor*, 508 U.S. 333 (1993), observed that the Constitutional right to present a complete defense has never been extended to the right to have affirmative defenses[8] presented effectively to the jury and that such complaints instead generally raise issues of state law error insufficient to provide grounds for federal habeas relief. *See id.* at 343–44 (discussing, *inter alia*, *Estelle v. McGuire*, 502 U.S. 62 (1991)). But as Justice O'Connor pointed out in her concurrence, there is a meaningful distinction between the due process requirements associated with the State's burden to prove the elements of an offense

---

[8] Technically speaking, self-defense is not an "affirmative" or "special" defense in Connecticut because once the defense is raised, the State must disprove justification beyond a reasonable doubt. *See State v. Bryan*, 307 Conn. 823, 834 (2013). Nevertheless, *Gilmore*'s reasoning suggests that a petitioner claiming he was deprived of the opportunity to present a defense other than the bedrock opportunity to negate the

and the defendant's burden to prove an affirmative defense. *Id.* at 350.

The test articulated in *Davis*, which provides the structure of Singleton's brief, is also inapposite. In *Davis*, the Second Circuit set forth a test to evaluate whether a state trial court's failure to provide an instruction to which the defendant was entitled under state law constituted a violation of federal constitutional due process. *See* 270 F.3d at 124; *see also Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005). In the present case, it is difficult to identify any such specific instruction—the nondeadly force instruction requested by Singleton's counsel would not have operated as a justification to the charged offenses, and Connecticut courts do not typically require an instruction on accident because that concept is inherent in the intent requirement.

In keeping with that practice, the Connecticut Supreme Court majority here held that no special instruction on accident was needed because the trial court eventually correctly instructed the jurors that intent was an element of the charged crimes. *See Singleton*, 292 Conn. at 752. I accept that ruling as a correct statement of state law, but doing so does not resolve the due process problem with the jury instructions in this case. The infirmity in the jury instructions was not the omission of a charge to which Singleton was entitled, but rather the oft-repeated direction to the jury that Singleton *had used* deadly physical force. Those lengthy and repeated instructions effectively told the jury that their choice on the question of intent was between the two types of deadly physical force: that undertaken to cause death and that undertaken to cause serious physical injury. The Connecticut Supreme Court majority's decision was thus an unreasonable application of *Cupp*'s directive to consider the jury instructions as a whole, because a generic intent instruction was wholly inadequate to ensure that the jury to considered Singleton's primary defense.

---

elements of the charged offense would face an uphill battle.

An examination of the record makes the majority's error clear: as the majority itself recognized, Singleton, the sole witness to the altercation, testified consistently that Cobbs' death occurred accidentally. *See Singleton*, 292 Conn. at 739 n.6 ("In his testimony at trial, the defendant denied any intent to stab the victim and claimed that he was uncertain how and exactly at what point the wound was inflicted."). Thus, Singleton's counsel's request for an instruction on the nondeadly use of force in self-defense is thus best understood as an *explanatory* component of that accident defense—that is, counsel's references to self-defense were intended to explain how Singleton's actions during the altercations that resulted in Cobbs' death were *not* indicative of an intent to cause him serious physical harm, but were rather the result of Singleton's effort to defend himself in a nondeadly manner from Cobbs' onslaught. Singleton's trial counsel thus essentially argued that Singleton had, at worst, committed involuntary manslaughter, an offense that was not charged and proof of which would have required acquittal. Both Singleton's counsel and the State asserted in their closing arguments that Singleton was acting in "self-defense." But the jury was not informed that Singleton's references to self-defense were intended to explain the circumstances of an accidental stabbing, rather than to justify an intentional one.

The Connecticut Supreme Court majority's opinion itself illustrates the confusion caused by that omission—although the Court recognized that Singleton's primary defense was one of accident or lack of intent, it analyzed defense counsel's arguments regarding nondeadly physical force entirely in the context of a justification defense *after* the issue of intent had been decided. For instance, it asserted:

> The defendant's and the Appellate Court's focus on the struggle preceding the stabbing is improper in this case. Once the jury found that the state had met its burden of proving beyond a reasonable doubt that the defendant intended to cause the victim serious physical injury and had caused his death by stabbing him with the knife, there was no

> disputed factual issue that required the jury to determine whether the defendant had used deadly or nondeadly physical force during the struggle. The defendant's intentional use of force during the struggle had no bearing on the ultimate question of whether he was guilty of murder or manslaughter in the first degree because both offenses were predicated on the fact that the defendant intentionally had stabbed the victim.

*Singleton*, 292 Conn at 755; *see also id.* at 755 n.16 (discussing the nondeadly physical force issue solely in the context of Singleton's self-defense claim). The problem with that analysis is that Singleton's nondeadly physical force argument was offered precisely to rebut the State's evidence of intent; accordingly, by assuming that the jury would have found intent first, before taking up the deadly/nondeadly physical force issue only in the context of a justification defense, the majority has given away the centerpiece of Singleton's accident defense. In the same vein, the majority rejected Singleton's argument that "the struggle over the knife was relevant to the charged crimes" as "unpersuasive because he was not charged with, and the jury was not instructed on, a crime that would have required proof that the fatal stabbing was the unintended or reckless consequence of the defendant's struggle with the victim over the knife." *Id.* at 756–57. But when one recognizes that Singleton's references to the force used in the struggle over the knife were intended to provide an alternative explanation for the course of events that would *negate* the intent element for both the murder and manslaughter charge, it becomes obvious that those circumstances were highly relevant to the crimes charged.

Like the Connecticut Supreme Court majority, the trial court treated Singleton's argument that he was acting "in self-defense" during the struggle over the knife as applying only to a justification defense. By doing so, the trial court effectively instructed the jury that Singleton had conceded that the stabbing was intentional. The self-defense instruction began as follows: "The defendant claims that he acted in self-defense. In claiming that he acted in self-defense, the defendant is claiming that *his use of deadly physical force* was reasonable." Tr. at 100 (Dec. 12,

2003) (emphasis added). As noted above, and as discussed by the dissenters at the Connecticut

Supreme Court, similar language is used at least ten more times in the instruction.[9] *Id.* at 100–04.

There is no mitigating language indicating to the jury that Singleton's use of deadly physical

_____

[9] The dissenting opinion in the Connecticut Supreme Court decision collected those references as follows:

(1) "a person is not justified in using deadly physical force when, *at the time he uses deadly physical force,* he does not reasonably believe [that] the other person is about to use deadly physical force against him or about to inflict great bodily harm to him"; (emphasis added);

(2) "[i]n deciding whether or not the state has proved beyond a reasonable doubt *that the defendant was not justified in using deadly physical force,* you will first focus on the defendant"; (emphasis added);

(3) "[y]ou first focus on what he, in fact, believed *at the time he used deadly physical force . . .* [and] then . . . focus on whether the defendant's belief was reasonable under all the circumstances that existed *when he used deadly physical force*"; (emphasis added);

(4) "[t]he act of [the victim] *leading to the defendant's use of deadly physical force* need not be an actual threat or assault"; (emphasis added);

(5) "you must . . . decide whether the *defendant reasonably believed that deadly physical force as opposed to a lesser degree of force was necessary* to repel [the victim's] attack"; (emphasis added);

(6) "you must decide whether, on the basis of all the evidence presented . . . *the defendant, in fact, believed that he needed to use deadly physical force as opposed to some lesser degree of force* in order to repel the [victim's] attack"; (emphasis added);

(7) "[i]f you decide [that] the *defendant did not . . . believe [that] he needed to use deadly physical force to repel the [victim's] attack,* your inquiry ends, and the defendant's self-defense claim must fail"; (emphasis added);

(8) "[i]f ... you find [that] *the defendant . . . did believe that the use of deadly physical force was necessary,* you must then decide whether that belief was reasonable under the circumstances"; (emphasis added);

(9) "[i]f you find [that] the state has proved . . . that the defendant was the initial aggressor and [that] the defendant did not effectively withdraw from the encounter or abandon it in such a way that [the victim] knew he was no longer in any danger from the defendant, you shall then find [that] *the defendant was not justified in using deadly physical force";* (emphasis added); and

(10) "the state has the burden to prove . . . [that] . . . *the defendant did not . . .believe he needed to use deadly physical force to repel the [victim's] attack . . . or . . .* [that] *the defendant did not have a reasonable basis for his belief that he needed to use deadly physical force to repel the [victim's] attack.*" (Emphasis added.)

force was not, in fact, admitted and was rather a preliminary factual question to be determined when considering the intent and causation elements of the charged crimes. Indeed, the term "deadly physical force" was used twenty-seven times in the jury instructions, whereas the term "accident" was never mentioned.

The trial court's definition of "deadly physical force," which followed immediately after the above-quoted statement, compounded the problem because it underscored to the jury that deadly physical force had an intent element matching the charged offenses—in fact, as Singleton pointed out in his Supreme Court brief, the State relied on the near-interchangeability between "deadly physical force" and the intent requirements for manslaughter and murder to assert that Singleton had effectively conceded the latter. *See* Def.-Appellee's Br. at 20 n.10 (App'x K) (discussing State-Appellant's Br. at 27–30). In accordance with Connecticut's statutory definition, the trial court stated that: "[d]eadly physical force means physical force which can be *reasonably expected to* cause death or serious physical injury." Tr. at 100 (Dec. 12, 2003) (emphasis added). The jury could easily conclude that by conceding his use of deadly physical force, Singleton was conceding that *he* "reasonably expected" his use of force to cause one of those two outcomes. Thus, by the end of the justification instruction, the jury would reasonably have believed that the *only* remaining question regarding intent was whether Singleton had intended to kill Cobbs (prompting a conviction on the murder charge) *or* merely to cause him serious physical injury (prompting a conviction on the manslaughter charge).

The United States Supreme Court instructs in *Cupp* that defective or prejudicial jury instructions should be examined "in the context of the overall charge." 414 U.S. at 146–47. "While that rule is usually invoked in response to a defendant's desire to concentrate on a single,

_____

*State v. Singleton*, 292 Conn. 734, 777–78 (2009) (Palmer and Katz, JJs, dissenting).

ailing section of a charge, it is equally applicable [to correct the State's errors]." *Morris v. Maryland*, 715 F.2d 106 (4th Cir. 1983). Here, by putting the self-defense / justification instruction first and by spending far more time on it than on the elements of the charged offenses, the trial court clearly signaled to the jury that whether Singleton was justified in his use of deadly physical force was both the first question they should consider and the key issue in the case. Long after that steady drumbeat of instructions stating that Singleton's use of deadly physical force had been conceded, the trial court issued brief and perfunctory instructions on intent and the elements of the charged offenses. The Connecticut Supreme Court majority asserted that the order in which the jury instructions were presented was unproblematic because the jury would "necessarily" have reasoned through the question of intent before reaching the issue of self-defense.[10] *Id.* at 753. That logical structure might be obvious to someone with legal training, but it was not clearly communicated to the jury. Instead, it is entirely plausible that a reasonable juror would consider the issues in the order presented to her by the trial court—first, whether Singleton was justified in his concededly intentional use of deadly physical force, and then, if she determined he was not justified, whether his intentional use of deadly physical force constituted murder or manslaughter. Although, as the Connecticut Supreme Court pointed out, juries are generally "presumed . . . to have followed the court's instructions," *id.* at 759 n.17, the instructions did not foreclose, but rather encouraged that order of reasoning—as noted above,

---

[10] The majority rested that assumption on the fact that the trial court "stated several times that the jury must decide, with respect to the charge of murder and the lesser offense of manslaughter in the first degree, *first*, that the defendant had the requisite intent, *second*, that, acting with the requisite intent, he caused the victim's death, and, *third*, that he was not justified in acting as he did." *Singleton*, 292 Conn. at 759 n.17 (emphasis original). But that emphasis is not as clear in the instructions themselves; instead it could just as easily be highlighting a numbered list (i.e., there are three things to think about here) rather than directing an *order* in which to reason through the items on that list. Consistent with the former reading, I note that the trial court's instruction on manslaughter—the crime for which Singleton was convicted—uses "one," "two," and "three" in place of "first," "second," and "third." In any event, such subtle semantics pale in comparison to the unambiguous directives the jury had already received in the

consistent with the instructions as given, the jury more likely viewed use of "deadly physical force" as conceded, and approached the later intent instruction as an instruction to decide between the mens reas for manslaughter and murder.

In *Morris v. Maryland*, 715 F.2d 106 (4th Cir. 1983), the Fourth Circuit squarely rejected an approach similar to that taken by the Connecticut Supreme Court majority in this case. In *Morris*, the Fourth Circuit granted a state habeas petition where the trial court's instructions included confusing language indicating that the defendant had the burden to prove an "accident" defense, which in turn reduced the State's burden to prove intent—one of the elements of the charged offenses of murder and manslaughter—beyond a reasonable doubt, and further compounded that error by charging the jury on the requirements of self-defense *before* explaining the elements of the charged offenses. *Id.* at 110–11. The *Morris* Court analyzed the cumulative effects of those errors as follows:

> The possibility that the jury's verdict was based in part on Morris's failure to satisfy this improperly imposed burden of proof is rendered more probable by the confused—and confusing—order of the judge's instructions: after a general instruction on the state's burden of proof, the judge charged the jury first on self-defense, then on the definitions of second degree murder, malice, first degree murder, manslaughter, and finally on the defendant's burden of proving mitigation, justification, or excuse. No specific instruction on accident was given. In essence, the state's argument is that we should focus our attention on the trial judge's correct instruction on the state's burden of proving all the elements of first degree murder, and assume that the jury followed this part of the charge rather than the constitutionally impermissible and logically inconsistent instructions on justification and excuse.

*Id.* at 110–11. Similarly here, the majority erroneously assumed that the jury would focus on an almost perfunctory intent instruction, rather than a lengthy justification charge hammering home Singleton's conceded use of deadly physical force.

Finally, in order to assess the full impact of a defective jury instruction, the Second

---

self-defense / justification instruction.

Circuit has also interpreted *Cupp* to require federal habeas courts to "take into account how the case was presented to the jury." *Harris v. Alexander*, 548 F.3d 200, 205 (2d Cir. 2008). Again, the broader view supports a finding of a due process violation. Unlike in *Henderson v. Kibbe*, 431 U.S. 145 (1977), where an incorrectly omitted issue was nevertheless brought to the attention of the jurors through the clear arguments of counsel, *see id.* at 153–54, in the present case, the testimony and closing arguments exacerbated the problem. Singleton's trial counsel had repeatedly stated that his claim was one of self-defense—that is to say, according to the instructions that followed, an intentional but justified use of deadly physical force—despite Singleton's consistent testimony that the stabbing was accidental. Indeed, at one point during the instruction, Singleton's counsel implored the jury to "listen very closely to that self-defense [instruction]." His trial counsel also suggested that the question of intent should be decided based on whether Singleton "was justified or he was not."[11] The State's closing argument made the problem worse, informing the jury in no uncertain terms that "if you believe absolutely what [Singleton] testified to . . . , then you have to acquit him because what he says is self-defense," when in fact, as discussed at length above, what Singleton testified to was *not* self-defense, as defined in by the trial court, but rather a *lack of intent*.

In sum, a properly-instructed jury could have reasonably concluded that Singleton was not guilty of any crime requiring intentional stabbing. But the *Singleton* jury was instead virtually compelled by the court's faulty instructions to find that—contrary to his own consistent testimony—he had *conceded* the issue of intent. I have no trouble concluding that the instructions given violated Singleton's right to a meaningful opportunity to present a defense and

---

[11] I note that the trial court also directly informed the jury that "[j]ustification is the legal term for self-defense. Whenever I used the words justified or justification, I am referring to the concept of self-defense."

to have the State prove every element of the charged offenses beyond a reasonable doubt. *See*

*Harris*, 548 F.3d at 206. Giving all due deference and respect to the legal reasoning of the

Connecticut Supreme Court, I nevertheless find objectively unreasonable its determination that

the jury instructions did not create a reasonable likelihood of misapplication in a manner that

violated  Singleton's due process rights. *See Sandstrom*, 442 U.S. at 516–17 (observing that

although a state supreme court is the final authority on questions of state law, "it is not the final

authority on the interpretation which a jury could have given the instruction").

C. Harmless Error

     Defective jury instructions are subject to harmless-error review. *See Hedgpeth v. Pulido*,

555 U.S. 57, 60 (2008) (collecting cases); *Sandstrom*, 442 U.S. at 527. The Connecticut Supreme

Court did not reach the question of harmless error because it determined that the instructions

were not defective. The Appellate Court, however, did reach the question, stating: "We cannot

conclude that the evidence in the present case was so overwhelming as to render the improper

instruction harmless. The jury reasonably could have found that the defendant used nondeadly

rather than deadly force in self-defense if instructed to consider that alternative." *Singleton*, 97

Conn. App. at 698. I agree with the Appellate Court—Singleton was the sole witness to the

altercation and there does not appear to be evidence in the record foreclosing the possibility of an

accident.[12] Like in *Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001), those defects "had a profound

---

[12] I note that the Connecticut Supreme Court majority may have been spurred on to its erroneous
conclusion at least in part because it found Singleton's account implausible and therefore saw no harm in
depriving the jury of a meaningful opportunity to consider it. That credibility determination, however,
was the exclusive province of the jury; moreover, the majority's reasoning rests on faulty assumptions.
The majority's opinion suggested that, to the extent the instructions had impermissibly lessened the
State's burden on the question of intent, that error had no effect on the outcome of the trial because—
despite the fact that he consistently testified that the stabbing was an accident—Singleton had "essentially
concede[d]" his use of deadly physical force at trial. *See Singleton*, 292 Conn. at 757–59. He did not. The

effect on the trial" because they deprived Singleton of the "credible defense" of accident and replaced it with a justification defense that would require the jury to discredit Singleton's own consistent testimony in order to succeed. *Id.* at 116.

As the Connecticut Supreme Court majority itself recognized, Singleton consistently stated that he did not intend to stab Cobbs, and had done so only accidentally in the course of a struggle over the knife. In that respect, Singleton's case is the inverse of *Blazic v. Henderson*, 548 F.2d 200 (2d Cir. 2008). In *Blazic*, the Second Circuit rejected the petitioner's claim that the trial court's refusal to instruct the jury on a justification theory constituted a deprivation of due process, in part because the Court observed that the jury verdict indicated that the jury had rejected the majority of the petitioner's testimony, which was the sole evidence supporting his justification claim. *Id.* at 543. In the present case, by contrast, a successful self-defense claim would have perversely required the jury to reject Singleton's consistent testimony that the stabbing was accidental, and find instead that he had acted intentionally, albeit with justification.

Moreover, there are several indications in the record that the defects I describe were not harmless, and instead had a real impact on the outcome of Singleton's case. The jurors asked for

---

Court arrived at that factually incorrect position as follows: first, it pointed out that Singleton had argued "there is no question that *intentionally* stabbing someone with a screwdriver is the use of deadly physical force, as is then coming at that person with a long kitchen knife." *See id.* at 757–58 (emphasis added) (quoting Singleton's Supreme Court brief). It then treated that as a concession that "stabbing a person with a knife constituted the use of deadly physical force," and further asserted that because the jury necessarily would have found intent before taking up the self-defense claim, the issue of deadly physical force had also essentially been conceded. *Id.* at 758–59.

The Supreme Court failed to recognize, however, that one could—and Singleton did—reasonably argue that a person holding a knife could die as a result of being stabbed by that knife during a struggle without deadly physical force being used against him. For instance, as Singleton grabbed the victim's wrists in an attempt to disarm him (clearly not a use of deadly physical force), the victim could have pulled away with sufficient force to wound himself or, in the course of the struggle, could have fallen onto the knife. Because those theories were entirely consistent with the evidence presented at trial, they should not have been foreclosed by the jury instructions. Rather, Singleton was constitutionally entitled to have those questions of fact resolved by a jury. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (The Sixth and Fourteenth Amendments "indisputably entitle a criminal defendant to a jury determination

multiple clarifications, including a clarification on the meaning of "intended;" they asked for the instructions to be repeated in full; and they announced they were deadlocked before finally coming to a decision—in sum, the confusion caused by the trial court's prejudicial instructions was evident and accordingly that error merits habeas relief.

**IV.        Conclusion**

In sum, I GRANT the petition (doc. # 1), DENY the respondent's motion for summary judgment (doc. # 15), and REMAND for a new trial consistent with this Order. Unless Singleton is retried within 60 days of this Order, he shall be released from custody.

So ordered.

Dated at Bridgeport, Connecticut, this 19th day of July 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.")
(internal quotation marks, alteration, and citation omitted).